**Mahamadu GUMANEH, Petitioner**

v.

**ATTORNEY GENERAL OF the UNITED STATES, Respondent.**

**No. 08–3756.**

United States Court of Appeals, Third Circuit.

Submitted Pursuant to Third Circuit LAR 34.1(a) Oct. 14, 2009.

Filed: Oct. 16, 2009.

Thomas V. Massucci, Esq., New York, NY, for Petitioner.

Zoe J. Heller, Esq., Craig Alan Newell, Jr., Esq., Aviva L. Poczter, Esq., United States Department of Justice, Office of Immigration Litigation, Washington, DC, for Respondent.

Before: SCIRICA, Chief Judge, CHAGARES and ALDISERT, Circuit Judges.

## OPINION OF THE COURT

PER CURIAM.

Mahamadu Gumaneh, a native and citizen of Sierra Leone, arrived in the United States without inspection. In 2000, Gumaneh filed an affirmative application for asylum, withholding of removal, and relief under the United Nations Convention Against Torture ("CAT"). He claimed that he was persecuted on account of imputed ethnicity; Gumaneh belongs to the Soninke ethnic group but lived in an area that was inhabited primarily by Mandingo.[1] Gumaneh alleged that he witnessed his parents and sister being shot and killed when Revolutionary United Front ("RUF") rebels attacked his village on June 15, 1999. At the time, Gumaneh was captured and taken to the rebel's camp, where he was held for five days and assaulted (he was dragged along the floor, his front teeth were knocked out, and he was stabbed in the right wrist). Gumaneh was able to escape when the rebels passed out from drinking alcohol and taking drugs. In May 2004, Gumaneh was charged with removability for entering the United States without being admitted or paroled. *See* Immigration and Nationality Act ("INA") § 212(a)(6)(A)(i) [8 U.S.C. § 1182(a)(6)(A)(i)].

The Immigration Judge ("IJ") concluded that Gumaneh was credible but denied his applications on the basis that he failed to demonstrate that he was persecuted on account of his imputed ethnicity. The IJ viewed the June 15, 1999, "incident as being exactly what the respondent repeatedly described it to be, an effort to get more people to join the rebel group, coupled with a certain amount of wanton, senseless, crazy violence directed at civilians for no particular reason at all except perhaps that the people who were doing these things were drunk." The IJ also concluded that Gumaneh did not have a well-founded fear of future persecution because the State Department County Report in the record indicated that the civil conflict in Sierra Leone ended in 2002. Finally, the IJ found that Gumaneh had not established that he was likely to be tortured.

The Board of Immigration Appeals ("BIA") dismissed Gumaneh's appeal. It agreed that:

> [w]hile the rebels *may* have been influenced to a small degree by ethnicity, it appears that their major motivation was to recruit new members. In other words, youth such as [Gumaneh] were targeted regardless of their ethnicity. The fact that the respondent happened to live in a town where an ethnic group of interest to the rebels resided does not automatically render him a refugee as defined by the Act.... Moreover, the respondent's mere inclination that the rebels were motivated by ethnicity is insufficient to support a mixed motive finding.

---

1. In his asylum application, Gumaneh stated that he was persecuted on account of his political opinion, *see* Administrative Record ("A.R.") 185, but later clarified that his applications for relief were based on imputed ethnicity. *See* A.R. 10.

The Board also concluded that Gumaneh had not meet his burden of proving that he has a well-founded fear of harm, that he was entitled to withholding of removal, or that he was qualified for CAT relief. Gumaneh filed a timely petition for review

Where the BIA issues its own decision on the merits, we review its decision and not that of the IJ. *See Kayembe v. Ashcroft,* 334 F.3d 231, 234 (3d Cir.2003). To be granted asylum as a refugee, an applicant must establish that he is unable to return to his homeland "because of persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion." INA § 101(a)(42) [8 U.S.C. § 1101(a)(42)]. Asylum relief may be available for aliens who were persecuted, or fear persecution, based on imputed grounds (e.g., where one is thought to be of a particular ethnicity or hold particular political opinions). *See Singh v. Gonzales,* 406 F.3d 191, 196 (3d Cir.2005). In addition, an asylum applicant need not demonstrate that the protected ground was the exclusive motivation behind the alleged persecution. Where an alien asserts more than one possible motive for the alleged persecution, one of which is a protected basis and others not, "an applicant need only show that his or her persecution was caused 'at least in part' by membership in a protected group." [2] *Ndayshimiye v. Att'y Gen.,* 557 F.3d 124, 129 (3d Cir.2009). We review the BIA's finding of a lack of connection between Gumaneh's imputed ethnicity and his mistreatment by the rebels for substantial evidence. *See Gomez–Zuluaga v. Att'y Gen.,* 527 F.3d 330, 344–45 (3d Cir. 2008).

In his asylum application, filed in 2000, Gumaneh indicated that he was seeking asylum based on his political opinion. *See* Administrative Record ("A.R."), 185. He stated that the "basis for my claim is principally the life threatening and brutal war going on in my country for the past nine years." *Id.* at 184. He further noted that the "rebels are killing innocent people every day whether you support them or not...." *Id.* at 186. In an affidavit prepared four years later, Gumaneh stated, without explanation, that he is seeking "political asylum." *Id.* at 130. In that affidavit, in statements made to an Asylum Officer, and in his testimony before the IJ, Gumaneh claimed that the rebels attacked his village with the intent of recruiting young men to join their cause. *Id.* at 87–88, 132, 178. When asked on direct examination whether the rebels were targeting any particular ethnic group, Gumaneh responded,

> [t]he area that we was living, so the head of the government of Sierra Leone, his ethnic is Mandingo, ... so when they attack our village, in their minds, since we are living with the Mandingo in Peyama, so they thought we are Mandingo ethnics too and particularly they go really after Mandingos....

*Id.* at 88.

Gumaneh's experiences certainly rise to the level of persecution. *See Camara v. Att'y Gen.,* 580 F.3d 196, 205 (3d Cir.2009) (noting "the near obviousness of the proposition that a person who has directly witnessed a brutal assault on a family member has experienced so devastating a blow as to rise to the level of persecution"). Nevertheless, we are convinced that the

---

2. Because Gumaneh applied for asylum before May 11, 2005, he is not subject to a provision in the REAL ID Act of 2005 that requires an alien applying for asylum in a mixed motive case, to show "that race, religion, nationality, membership in a particular social group, or political opinion was or will be at least one central reason" for the alleged persecution. *See* INA § 208(b)(1)(B)(i) [8 U.S.C. § 1158(b)(1)(B)(i)].

evidence does not compel the conclusion that such persecution occurred on account of a protected ground.[3] The testimony quoted above is the only suggestion in the record that the rebels were motivated by Gumaneh's imputed ethnicity. *Cf. Amanfi v. Ashcroft*, 328 F.3d 719, 727 (3d Cir.2003) (stating that the "mention of religion in the fabric of the story is insufficient to establish a persecution claim."). All the other evidence points to the conclusion that the rebels were indiscriminately attacking the village and seeking to recruit young men, not targeting any particular ethnic group. Indeed, Gumaneh asserted that the rebels "descended upon our peaceful town with the intent of utter destruction," that they "went house to house" attacking the villagers, and that "[n]ot a word was uttered to us" by the rebels. *See* A.R. 131. Of course, "generalized lawlessness and violence between diverse populations" will not support relief. *Abdille v. Ashcroft*, 242 F.3d 477, 494–95 (3d Cir.2001). To the extent the rebels sought to recruit Gumaneh, those efforts alone are insufficient to compel a finding of persecution based on a protected ground. *See Velasquez–Valencia v. INS*, 244 F.3d 48, 50–51 (1st Cir. 2001) (holding that alien was not entitled to asylum based on evidence that Guatemalan guerillas sought to recruit him to their side in a civil war because there was no indication that his political beliefs had anything to do with efforts to recruit him).

Because Gumaneh cannot satisfy the asylum standard, he cannot satisfy the more difficult withholding of removal standard. *See Zubeda v. Ashcroft*, 333 F.3d 463, 469–70 (3d Cir.2003). Additionally,

while a person seeking protection under the CAT need not prove that he was persecuted due to any protected status, any possibility of torture in this case appears to be negated by the improved country conditions in Sierra Leone. *See Kaita*, 522 F.3d at 300–01.

For the foregoing reasons, we will deny the petition for review.

---

**3.** In addition, the BIA properly affirmed the IJ's conclusion that Gumaneh did not have a well-founded fear of future persecution because of changes in Sierra Leone. According to the State Department Country Report for 2005, the civil war ended in 2002, the government asserted control over the entire country, and RUF members were indicted by a war

crimes tribunal. *See Kaita v. Att'y Gen.*, 522 F.3d 288, 301 (3d Cir.2008) (noting, in the context of a CAT claim, that the 2006 Country Report "suggests that, although there are still some serious problems in many areas of Sierra Leone, the country conditions have greatly improved.").